E-FILED
Thursday, 10 February, 2011 02:47:58 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | |
|---|---|
| KENNETH W. SIMMONS ) <br> ) <br> Plaintiff, ) <br> v. ) <br> ) <br> CRAIG CATTON, ) <br> BRENT TROYER, and ) <br> SHERIFF ROBERT HUSTON, ) <br> *individually, and in his official capacity,* ) <br> ) <br> Defendants. ) | Case No. 10-CV-2168 |

## **OPINION**

Pro Se Plaintiff, Kenneth W. Simmons, filed a multicount Second Amended Complaint (#38) on April 13, 2009, against Defendants Craig Catton, Brent Troyer, and Tazewell County Sheriff Robert Huston, in his individual and official capacity. On June 18, 2010, Defendants' filed their Motion for Summary Judgment (#145). Plaintiff filed two "Motions to Consider Evidence" (#157), (#164). For the following reasons, Plaintiff's Motions to Consider Evidence (#157), (#164) are GRANTED and Defendants' Motion for Summary Judgment (#145) is GRANTED in full.

### BACKGROUND

This case arises out of an incident between Plaintiff and Defendants Catton and Troyer that occurred in Tazewell County on April 25, 2008. On that date, Defendant Troyer, employed as a Deputy Sheriff for Tazewell County, was dispatched to 12836 Appenzeller Road (Plaintiff's home) to investigate a report and complaint that Plaintiff was throwing dog feces from his dog kennel onto a public roadway. Due to Troyer's prior interactions with Plaintiff, and being made aware of other prior interactions between Plaintiff and law enforcement, Troyer believed that

Plaintiff was prone to hostile behavior when contacted by law enforcement officials. Troyer believed it was not safe to approach Plaintiff's house alone and requested the presence and assistance of a Mackinaw Police Department officer. Troyer was assisted in the service call by Mackinaw Police Officer Travis Cowley.

Upon arriving, Troyer approached the residence and stood on the front porch. Troyer knocked on the front door and, after waiting for a minute or two, saw Plaintiff open a window adjacent to the porch. According to Troyer, Plaintiff yelled and cursed at him, informed Troyer he was being recorded, and demanded Troyer exit his property. Troyer explained the reason for his presence to Plaintiff, but Plaintiff began to again curse at Troyer and Cowley and slammed the window shut. After Plaintiff shut the window, Troyer immediately left the property and returned to his vehicle. Troyer was advised by his sergeant to take pictures of the feces in the road and write a report about his encounter with Plaintiff, which he did. As Troyer was taking the photos, Plaintiff began yelling at Troyer from the window and took photographs of Troyer and Cowley. Troyer completed photographing the feces and exited the area.

Troyer, in his affidavit, states that the entire encounter on Plaintiff's porch lasted no more than a few minutes. Troyer denies conducting any kind of search on Plaintiff's property. Troyer denies threatening Plaintiff in any way. Troyer claims his purpose in approaching Plaintiff's residence was to investigate a complaint made that Plaintiff was depositing dog feces in the roadway and that his only intent in approaching Plaintiff's residence on April 25, 2008 was to speak to him. Troyer denies looking in the window for the purpose of any kind of search and, rather, looked in the window for officer safety reasons, to (1) see if anyone was coming to answer his knock and (2) he was aware (due to his own prior interactions with Plaintiff and the

2

experience of others) that Plaintiff was prone to hostile behavior when contacted by or in communication with law enforcement officials. Further, Troyer had been made aware by the Sheriff's Department that Plaintiff or his wife may be in possession of a firearm. Troyer denies keeping his hand on his gun the entire time at Plaintiff's residence. Troyer has never been informed by any party that Plaintiff has ever sent a letter demanding that no Sheriff's Department employee enter his property without a warrant. Troyer's version of events is backed up by the affidavits of Officer Cowley and Sgt. Craig Catton.

Plaintiff's affidavit, filed with his Response (#153), claims that there was no kennel in his yard or residence on April 25, 2008, as it had been destroyed in a previous incident and given to a neighbor. Plaintiff, and his wife in her affidavit, claim that their previous interactions with Troyer had been cooperative. For the April 25, 2008 incident, Plaintiff claims Troyer "kept beating on my door until I answered." Plaintiff claims Troyer and Cowley had their hands on their guns at all times. Plaintiff claims he felt threatened because Troyer kept asking him to come outside. Plaintiff claims that Troyer refused to leave when asked and continued to look in Plaintiff's windows. Plaintiff claims that Troyer was in his yard for approximately twenty to thirty minutes, in which five to ten minutes were spent looking into his windows.

Plaintiff, in his affidavit, also claims he called the Sheriff's Department on November 19, 2008, and was forwarded to Defendant Catton. Plaintiff claims that when he spoke with Catton, Catton informed Plaintiff that he knew who Plaintiff was and, due to a prior lawsuit Plaintiff filed against the county, would not investigate Plaintiff's call. Catton then hung up the phone. In his affidavit, Catton denies speaking with Plaintiff on November 19, 2008, and denies ever having met Plaintiff. Further, Catton denies a Sheriff's Department policy existed of refusing to

respond to or properly investigate complaints made by Plaintiff. Rather, Catton states that the Department has responded to numerous complaints made by Plaintiff over the years. In support of this contention, Defendants attached Tazewell County Sheriff's Department incident reports dated from 2005-2009, which show their deputies routinely responded to various complaints made by Plaintiff. Catton's statements are affirmed by Sheriff Robert Huston in his affidavit. Plaintiff filed a compact disc recording of the phone call he placed to the Sheriff's Department on November 19, 2008, but the compact disc only includes a recording of Plaintiff speaking with dispatch and being told he would be transferred to Sgt. Catton. At that point, the recording ends.

## ANALYSIS

Following various motions to dismiss and the amended complaint filings, Plaintiff's remaining claims in this case are as follows: (1) Defendant Troyer unlawfully searched Plaintiff's home by making a visual inspection; (2) Defendants Catton and Huston retaliated against him by, as an official policy or practice, directing Plaintiff's neighbor Larry Morgan to commit criminal acts against Plaintiff and then selectively choosing to prosecute Plaintiff, while ignoring Plaintiff's complaints against Morgan, all in retaliation for a prior lawsuit of Plaintiff's against county deputies- thus violating the retaliation provision of Title VII and Equal Protection; (3) Sheriff Huston failed to train and supervise his employees to prevent them from committing the aforementioned constitutional violations; and (4) Troyer violated state trespass law while on Plaintiff's property .

**Motions to Consider Evidence**

Plaintiff has also filed Motions to Consider Evidence (#157), (#164), concerning evidence of the November 19, 2008 phone call (#157) between Plaintiff and the Sheriff's Department and photographic evidence of no dog kennel being at Plaintiff's home on April 25, 2008 (#164). Defendants oppose both motions, however the court is confident in its ability to only consider evidence that is properly before it. Therefore, both motions (#157), (#164) will be GRANTED and the court will consider the evidence presented only so far as it is relevant and properly before the court.

**Motion for Summary Judgment**

Summary Judgment Standard

Under Federal Rule of Civil Procedure 56 a district court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, a district court has one task and one task only: to decide, based upon the evidence of record, whether there is any material dispute of fact that requires a trial. Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994). In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Burwell v. Pekin Cmty. High Sch. Dist. 303, 213 F. Supp. 2d 917, 929 (C.D. Ill. 2002). Speculation, however, is not the source of a reasonable inference. See Burwell, 213 F. Supp. 2d at 929, citing Chmiel v. JC Penney Life Ins. Co., 158 F.3d 966, 968 (7th Cir. 1998). Further, "[i]n a § 1983 claim, the plaintiff bears the burden of proof on the constitutional deprivation that underlies the claim, and thus must come forward with sufficient evidence to

5

create genuine issues of material fact to avoid summary judgment." McAllister v. Price, 615 F.3d 877, 881 (7th Cir. 2010).

Count 1: Illegal Search

Plaintiff contends that Deputy Troyer unreasonably searched his property on April 25, 2008. Magistrate Judge Byron Cudmore construed Plaintiff's filings to allege that Troyer "entered into and searched Plaintiff's 'curtilage' rather than simply an open field or other area that carried no expectation of privacy." Defendants respond that Plaintiff's Fourth Amendment rights were not violated and no search of Plaintiff's property took place.

"The Fourth Amendment, applied to the states by the Fourteenth Amendment, [citation omitted], provides that '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." Bleavins v. Bartels, 422 F.3d 445, 450 (7th Cir. 2005), quoting U.S. Const. amend. IV. Both the home itself and the home's curtilage- i.e. the area outside the house but so close to and intimately connected with the home and the activities that normally go on there that it can reasonably be considered part of the home- are within the scope of the Fourth Amendment's protection. Bleavins, 422 F.3d at 450-51. Curtilage is a property based concept, and remains important in evaluating privacy interests. Bleavins, 422 F.3d at 450. A warrantless search of a home's curtilage implicates the very core of the Fourth Amendment and is presumptively unreasonable. Bleavins, 422 F.3d at 451.

In this case, Plaintiff alleges the illegal search took place while Troyer looked in his window and yard. Plaintiff alleges Troyer did not leave when told to, and was in his yard for 20-30 minutes, and five of those minutes were spent looking in his window. There is no question that the yard and bushes connected to the house, or the windows, would constitute at the

6

very least curtilage. The issue, rather, is whether Troyer conducted an illegal search so as to violate the Fourth Amendment.

> "The touchstone of Fourth Amendment inquiry is reasonableness, a standard measured in light of the totality of the circumstances and determined by balancing the degree to which a challenged action intrudes on an individual's privacy and the degree to which the action promotes a legitimate government interest." Green v. Butler, 420 F.3d 689, 694 (7th Cir. 2005).

In order to pass muster under the Fourth Amendment, the government search must be reasonable, and "'the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application... [it] requires careful attention to the facts and circumstances of each particular case.'" Belcher v. Norton, 497 F.3d 742, 748 (7th Cir. 2007), quoting Donovan v. City of Milwaukee, 17 F.3d 944, 949 (7th Cir. 1994). To determine whether a particular search is legal, the court must balance the extent of the intrusion against the need for the search. Belcher, 497 F.3d at 748.

In support of their contention that no Fourth Amendment violation occurred, Defendants cite to the First Circuit case United States v. Daoust, 916 F.2d 757 (1st Cir. 1990). In that case the police, while investigating illegal drug activities, learned that Daoust might have useful information and went to his home to speak with him. Daoust's home was an isolated log house on the side of a hill and did not have electricity or a telephone. The police found the front door inaccessible, as it was five feet above ground and had no steps. Seeing no car but noticing toys in the driveway, the police knocked on the glass cellar door. After receiving no answer, the police left. The police returned two weeks later and again received no answer after knocking on

the cellar door. They then walked up a slope to the back of the house where one of the officers, while looking through the above-eye-level kitchen window, spotted a gun hanging above the sink. Daoust was convicted of being a felon in possession of a weapon and appealed, arguing that the police had no right to be at the back of his house looking through the window and were in violation of the Fourth Amendment.

The First Circuit rejected Daoust's argument. The court noted that a policeman may lawfully go to a person's home to interview him and, in doing so, can obviously go up to the door and, "if that door is inaccessible there is nothing unlawful or unreasonable about going to the back of the house to look for another door, all as part of a legitimate attempt to interview a person." Daoust, 916 F.2d at 758. The court found that the police were looking up through the window simply to see if someone was at home so they could conduct an interview, and not to see if unlawful activity was taking place. The court concluded this was lawful. Daoust, 916 F.2d at 758.

The court agrees with Defendants that the actions of Deputy Troyer did not violate Plaintiff's Fourth Amendment rights. The only pieces of evidence offered by Plaintiff in support of his allegation is his own affidavit and that of his wife and compact discs of Plaintiff's phone calls to police dispatch[1] on April 25, 2008. Taken in the light most favorable to Plaintiff, all the

---

[1]The recordings from dispatch reveal that tempers were high on all sides during the April 25, 2008, disturbance. When being dispatched to Plaintiff's residence, Troyer asked, seemingly in frustration, "the fucking Simmons residence?," indicating he had been called out there before for neighbor disputes. After the incident, Troyer called in to dispatch, referred to Plaintiff as an "asshole" and told dispatch that Plaintiff had called him "seven kinds of motherfucker" during their conversation. Plaintiff also does not acquit himself well on the recordings, saying "tell Deputy Troyer and the Mackinaw fucking cops to get the hell away from my house" and that he was going send an email to the Mackinaw city lawyer. It cannot be discerned whether Troyer was still on Plaintiff's property or if he was already taking pictures of the feces in the road.

8

evidence establishes is that Troyer looked in Plaintiff's window and that he was in the yard for 20-30 minutes. Troyer admits that he looked in the window, but did so to (1) see if anyone was home, because no one had responded to his knocking; (2) see who was coming to the door due to officer safety reasons; and (3) to speak with Plaintiff, who refused to come and answer the door. Troyer's presence on Plaintiff's property did not represent a significant intrusion into Plaintiff's privacy and use of his land. Troyer did not enter into Plaintiff's home or any of his structures. Troyer did not search Plaintiff's vehicle. If there was any intrusion or search, it was at most looking into Plaintiff's window or looking around the yard.

This must be balanced against the "need for the search" and the reasons for Troyer's actions. See Belcher, 497 F.3d at 748. Troyer stated in his affidavit that he knocked on the door and received no answer, so he looked in the window to determine if anyone was home. This was supported by the other officer present. Further, due to prior hostile interactions with Plaintiff, and with knowledge that Plaintiff had weapons in his house, he wanted to see who might be coming to the door for officer safety reasons. Then, when Plaintiff refused to come outside to speak with Troyer, he had to look through the window to communicate with Plaintiff. Troyer's presence on Plaintiff's property was necessary in order to investigate the possible commission of a crime, and his looking in the window was part of a legitimate attempt to interview Plaintiff. See Daoust, 916 F.2d at 758. Taking all the facts in the light most favorable to Plaintiff, and balancing the extent of the intrusion against the need for the search, the court concludes Troyer's

---

Plaintiff says he will take pictures of the police and threatens to take the case to a federal judge. He also refers to the dispatcher as an "idiot." However, the recordings shed no light on any illegal search of Plaintiff's property, except to reinforce that he did not want the police there, a fact which all parties agree on.

actions were reasonable.  See Belcher, 497 F.3d at 748.  Therefore, judgment is granted for Defendants and against Plaintiff on the illegal search count.

        Counts 2 and 3: Equal Protection "Class of One" and Retaliation Claim

        Count 2: Equal Protection "Class of One" Claim

In his Report and Recommendation (#63) of September 8, 2009, the magistrate judge in denying a portion of Defendants' Motion to Dismiss (#55), found that Plaintiff had made the gist of a constitutional claim when he alleged that Sgt. Catton refused to investigate Plaintiff's complaint against his neighbor on November 19, 2008.  This could conceivably violate the Equal Protection Clause, "where the decision to prosecute is made either in retaliation for the exercise of a constitutional right, such as the right to free speech or to the free exercise of religion, or because of membership in a vulnerable group."  Esmail v. Macrane, 53 F.3d 176, 179 (7th Cir. 1995).

The magistrate found Plaintiff could be making a case, albeit a "liberally construed" one, for a "class-of-one" equal protection claim: that Defendants treated him differently than others similarly situated based on a "totally illegitimate animus."  Maulding Development, LLC v. City of Springfield, 453 F.3d 967, 970 (7th Cir. 2006).  However, it is difficult for a plaintiff to succeed on such a "class of one" claim.  Maulding, 453 F.3d at 969.  To establish a class of one claim, Plaintiff must show: (1) he has been intentionally treated differently from others similarly situated; and (2) there is no rational basis for the difference in treatment or the cause of the differential treatment is a "totally illegitimate animus" toward Plaintiff by the Sheriff's Department.  Maulding, 453 F.3d at 970.  The lack of evidence of someone who is similarly

situated but intentionally treated in dissimilar manner will doom a claim. See Maulding, 453 F.3d at 970.

Here, Plaintiff's claim fails because he cannot show, and has provided no evidence of, a similarly situated person being treated differently from himself. See Maulding, 453 F.3d at 970. The telephone recording of the November 19, 2008, phone call he placed to the Sheriff's Department, where he claims Sgt. Catton told Plaintiff his claim would not be investigated due to Plaintiff's prior lawsuit against the department, cuts off before Sgt. Catton comes on the line. Plaintiff's only evidence of the conversation is contained in is own affidavit. Further, the police reports attached to both Defendants' Motion for Summary Judgment and Plaintiff's Response show that the Sheriff's Department routinely responded to calls and complaints made by Plaintiff from 2005 to 2009, seriously undermining Plaintiff's contention that he was denied police service due to a prior lawsuit he filed against the department. Since Plaintiff has provided no evidence that he was treated differently from a similarly situated individual, judgment must be granted for Defendant on Plaintiff's equal protection "class of one" claim.

Count 3: Retaliation

Plaintiff claims that the Sheriff's Department has retaliated against him for an earlier lawsuit he filed against the department. In support of this claim, Plaintiff argues that the department refuses to investigate his complaints to service his calls.

In construing Plaintiff's claim, the magistrate judge stated: "Defendants' actions were in retaliation for Plaintiff's right to petition the government for redress." In essence, Plaintiff has stated a claim for First Amendment retaliation. To establish a prima facie case for First Amendment retaliation, Plaintiff must meet three requirements: (1) he engaged in activity

protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was at least a motivating factor in the Defendants' decision to take the retaliatory action. Woodruff v. Mason, 542 F.3d 545, 551 (7th Cir. 2008).

Plaintiff's retaliation claim is based on the same facts alleged as the equal protection claim "class of one" claim, and thus fails for the same reasons. Plaintiff cannot prove that he suffered a deprivation likely to deter First Amendment activity in the future, as the numerous attached police reports show that the Sheriff's Department continued to respond to his calls and complaints. Further, he can show no evidence of his First Amendment activity being a motivating factor in Defendants' decision to take retaliatory action (action the court has found did not occur). Plaintiff's allegation that Sgt. Catton told him the department would not respond to Plaintiff's complaint due to the earlier lawsuit remains just that, an allegation, as the recording provided by Plaintiff cuts off before Plaintiff and Catton speak. Judgment is granted for Defendant on Plaintiff's retaliation claim.

Count 4: Failure to Train

Plaintiff alleges that Sheriff Huston, in his official capacity as policy maker, failed to train and supervise his employees to prevent them from committing the aforesaid constitutional violations on April 25, 2008. A governmental unit is not liable under 42 U.S.C. § 1983 unless the deprivation of rights is caused by its own custom or policy. Walker v. Sheahan, 526 F.3d 973, 977 (7th Cir. 2008). Although a municipality may be directly liable for constitutional violations by its officers when the municipality evinces a deliberate indifference to the rights of the plaintiff by failing to train adequately its officers to prevent the violation, there can be no

12

liability under Monell v. Department of Social Services of the City of New York, 436 U.S. 658 (1978), for failure to train when there has been no violation of the plaintiff's constitutional rights. Jenkins v. Bartlett, 487 F.3d 482, 492 (7th Cir. 2007).

Plaintiff's claim fails under any of the above three delineated methods. None of the evidence provided by Plaintiff, whether on CD, photograph, or affidavit, is related in any way to his failure to train claim. Plaintiff has provided no competent evidence that his constitutional rights were violated by any custom or policy of the Tazewell County Sheriff's Department. Instead, it appears Plaintiff relies on the mere allegation contained in his complaint, which is not sufficient to overcome a well supported motion for summary judgment. See Liu v. T & H Machine, Inc., 191 F.3d 790, 794-95 (7th Cir. 1999). Further, as the court has already found that no government employee violated Plaintiff's constitutional rights, there can be no liability on the part of Defendant Huston for failure to train. See Jenkins, 487 F.3d at 492. Judgment is granted for Defendants on Plaintiff's failure to train claim.

Count 5: State law trespass claim

Finally, Plaintiff alleges that Defendant Troyer violated Illinois state trespass laws by searching his property after being asked to leave and ignoring the no trespassing signs Plaintiff had posted. In Illinois, to sustain a cause of action for trespass to real property, a plaintiff must allege a wrongful interference with his actual possessory rights in the property. Loftus v. Mingo, 511 N.E.2d 203, 210 (Ill. App. Ct. 1987). To be an actionable trespass, an intrusion has to be such as to subtract from the owner's use of the property. Geller v. Brownstone Condominium Association, 402 N.E.2d 807, 809 (Ill. App. Ct. 1980).

Illinois courts have addressed the status of police officers who enter the land of another in the scope of their employment. Loftus, 511 N.E.2d at 210. In Loftus, the plaintiff filed claims against a police officer who parked his car in the driveway of the plaintiff's property. The plaintiff struck the police car while driving his own vehicle and filed suit alleging a number of claims including a state law trespass claim. In citing to an Illinois Supreme Court opinion, the Loftus court wrote:

> "'The courts have encountered considerable difficulty in dealing with public officers, firemen and the like, who come upon the land in the exercise of a legal privilege and the performance of a public duty. Such individuals do not fit very well into any of the more or less arbitrary categories which the law has established. They are not trespassers, since they are privileged to enter. The privilege is independent of any permission or license of the possessor, and there is no right to exclude them." Loftus, 511 N.E.2d at 210, quoting Ryan v. Chicago & Northwestern Railroad Company, 42 N.E.2d 128, 133 (Ill. 1942).

The Loftus court noted that the plaintiff had failed to allege in his complaint that the officer was not on his property in the course of performing his official duties as a police officer and had failed to allege any interference with the plaintiff's possessory rights in the property. Loftus, 511 N.E.2d at 210. The court concluded that the officer was not a trespasser and that the plaintiff had failed to state a claim for trespass. Loftus, 511 N.E.2d at 210.

The evidence on record in this case clearly shows that Defendant Troyer was on Plaintiff's property in the course of performing his official duties as a police officer. He had been called to investigate a complaint of dog feces in the road. Troyer was simply investigating

14

the call during his attempt to interview Plaintiff by knocking on his door and looking in the window. After knocking on Plaintiff's door, looking in the window to both determine if anyone was coming to the door and to speak with Plaintiff, Troyer left the property and returned to his squad car. Even taking as true all of Plaintiff's allegations, Troyer was only on the property for 20-30 minutes, consisting mostly of trying to speak with Plaintiff or looking in his window. Plaintiff does not, in any of his filings, show how Troyer's presence on the property actually interfered with his possessory rights as to the property. As Troyer's brief time on Plaintiff's property was pursuant to the performance of his official law enforcement duties and did not interfere with Plaintiff's possessory rights in the property, judgment must be granted for Defendants on this count. See Loftus, 511 N.E.2d at 210.

IT IS THEREFORE ORDERED:

(1) Plaintiff's Motions to Consider Evidence (#157), (#164) are GRANTED.

(2) Defendants' Motion for Summary Judgment (#145) is GRANTED in its entirety.

(3) Judgment is GRANTED for Defendants and AGAINST Plaintiff.

(4) This case is terminated.

ENTERED this  10th  day of  February , 2011.

s/ MICHAEL P. McCUSKEY
CHIEF U.S. DISTRICT JUDGE